**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ANDREW WALZER,

                              Plaintiff,                    Civ. No. 04-5672 (DRD)

v.                                                          **O P I N I O N**

MURIEL SIEBERT & CO., INC., ET AL.,

                              Defendants.

*Appearances by:*

ANDREW WALZER
771 Bradley Parkway
Blauvelt, NY 10913

        *Pro Se Plaintiff,*

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, PA
by: Morrill J. Cole, Esq. and Nicholas R. Weiskopf, Esq.
25 Main Street
P.O. Box 800
Hackensack, NJ 07602

        *Attorneys for Defendant Muriel Siebert & Co., Inc., Muriel Seibert, Gerard Koske, and*
        *Ronald Bono*

THOMPSON HINE, LLP
by: Rebecca Brazzano, Esq. and Michael G. Shannon, Esq.
335 Madison Avenue
New York, NY 10017

        *Attorneys for Defendant National Financial Services, LLC*

**DEBEVOISE, Senior District Judge**

This matter comes before the Court on a motion submitted by Plaintiff, Andrew Walzer, for reconsideration pursuant to Federal Rule of Civil Procedure 60(b) of the Court's August 10, 2010 Opinion and Order dismissing his claims against Defendants[1] under the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, et seq. In their opposition to that Motion, Defendants argue that the Court's ultimate ruling was correct, but request modifications to three statements contained in the August 10, 2010 Opinion in order to correct what they contend are errors. Specifically, Defendants assert that the Court's use of the term "options agreement" to describe a contract between Defendant Muriel Siebert and Company, Inc. ("MSC") and Mr. Walzer allowing the latter to trade equities on margin should be changed to "margin agreement," and that the Court's reference to a 1982 iteration of that document should be deleted in favor of the last undisputedly authentic version, which the parties to that agreement entered in 1992. Additionally, Defendants argue that the Court erred by stating that the arbitral ruling at issue in its previous decision was made "without the benefit of discovery," and should delete that statement from its August 10, 2010 Opinion.

For the reasons set forth below, Mr. Walzer's Motion for Reconsideration will be denied. It is well-established that a request for reconsideration pursuant to Rule 60(b) must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

---

[1] There are two groups of Defendants. The first (collectively, "MSC Defendants"), is made up of Muriel Siebert & Company, Inc. ("MSC"); Muriel Siebert, the Chief Executive Officer of that company; Gerald Koske, one of its compliance officers; and Ronald Bono, a vice-president of MSC. The second consists of National Financial Services, LLC ("NFS"), the clearing broker that underwrote investments Mr. Walzer made through MSC.

Mr. Walzer has failed to articulate one of those grounds, and his mere disagreement with the Court's earlier decision cannot serve as a basis for his request.

For similar reasons, the Court declines to make the alterations to its earlier ruling requested by Defendants. Absent one of the three aforementioned factors, a Motion for Reconsideration is not an invitation for the parties to second-guess the language used in an earlier ruling. None of the three statements of which Defendants complain had any effect on the Court's ultimate ruling or resulted in prejudice to the Defendants. In fact, none of those statements were erroneous. The Court's use of "options agreement" to refer to the contract between Mr. Walzer and MSC was drawn directly from an earlier ruling by the Court of Appeals for the Third Circuit in this case. Moreover, it is abundantly clear from any reasonable examination of the August 10, 2010 Opinion that the Court was referring to the agreement between MSC and Mr. Walzer allowing the latter to trade securities on margin. Defendants' contention that the Court erred by stating that the arbitral decision was made "without the benefit of discovery" is even less meritorious, as that statement was taken directly from the brief submitted by Defendant National Financial Services in support of its Motion to Dismiss Mr. Walzer's claims under the Exchange Act. Furthermore, despite an unsupported assertion that they would "suffer prejudice" if the Court refused to remove that clause from its August 10, 2010 Opinion, the Defendants have not articulated how the statement – related to state law claims the Court dismissed over five years ago and which have since been dismissed by an arbitration panel – caused them any conceivable harm. Finally, Defendants' contention that the Court erred by referring to the 1982 version of the options agreement is more indicative of their failure to carefully read the August 10, 2010 Opinion than of a lack of accuracy in that ruling. Like the previous decision by the Court of Appeals, the August 10, 2010 Opinion referred to

1982 as the year in which Mr. Walzer and MSC initially entered into an agreement allowing the former to trade equities on margin.  It did not, however, state that the 1982 version of the options agreement was the operative one for the purposes of this litigation.  Rather, the Court repeatedly noted that the last undisputedly authentic version of that document was executed in 1992.

## I.  BACKGROUND

The circumstances underlying this case were set forth comprehensively in the Court's August 10, 2010 Opinion.  See Walzer v. Muriel Seibert & Co., Inc., 2010 WL 3174458 (D.N.J. 2010) (hereinafter "Walzer II").  The Court incorporates by reference the "background" section of that ruling.  In order to add context to today's decision, some of the facts set forth therein are repeated below.

As discussed in the Court's earlier ruling, this case involves a dispute over a forced sale of securities.  Mr. Walzer maintained a personal brokerage account with MSC starting in the early 1980s.  In 1982, he entered into an options agreement[2] with MSC that gave him margin privileges.  Mr. Walzer and MSC periodically renewed that agreement throughout their relationship.

In 2002, MSC notified Mr. Walzer that he must increase the percentage of equity held in his account.  He refused, claiming that the equity in his account met the minimum requirements imposed by New York Stock Exchange ("NYSE") and Federal Reserve rules.  As a result, Mr. Walzer faced numerous margin calls, which culminated in the forced sale at a loss of approximately $802,000 of the securities held in his account.

Following the forced sale of his securities, MSC produced what it claimed was the most recent version of Mr. Walzer's options agreement, which was dated August 29, 1996 and

_____

[2] Both sides contend that the Court should have used the term "margin agreement" to refer to that contract in its earlier ruling.  Those contentions will be discussed below.

allowed the company to raise his equity requirements above the minimums set by the NYSE and Federal Reserve.  Claiming that document was a forgery, Mr. Walzer filed a suit in the Supreme Court of New York in which he asserted claims against MSC for (1) breach of contract, (2) fraud, and (3) breach of fiduciary duty.  While that litigation was still pending, Mr. Walzer filed a second action in this Court, in which he added various Defendants that had not been named in his state suit. In his Complaint, Mr. Walzer reiterated his state law claims, but also alleged that the Defendants violated the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, et seq., and accompanying regulations.

In 2005, the New York court granted MSC's request to compel arbitration of Mr. Walzer's claims before a panel of the Financial Industry Regulatory Authority ("FINRA") on the grounds that the 1992 iteration of Mr. Walzer's options agreement – the last undisputedly authentic version of that contract – required arbitration of all disputes arising under that agreement.  See Walzer II, 2010 WL 3174458 at *1 (discussing the New York court's decision). Following that ruling, Defendants in this action moved to dismiss on the grounds that the New York judgment compelling arbitration barred Mr. Walzer's claims under the doctrines of res judicata and collateral estoppel.  The Court granted that Motion on June 30, 2005.  Mr. Walzer sought reconsideration, and when that request was denied, timely appealed.

In a decision dated April 4, 2007, the Court of Appeals for the Third Circuit affirmed the dismissal of Mr. Walzer's state law claims. Walzer v. Muriel Siebert & Co., Inc., 221 F. App'x 153, 156 (3d Cir. 2007) (hereinafter "Walzer I").  The Court of Appeals reversed the dismissal of Mr. Walzer's claims under the Exchange Act, however, and remanded for consideration of those claims.  Id.

On December 30, 2009, the FINRA panel to which Mr. Walzer's state law claims were referred issued a decision dismissing those claims in their entirety.  Defendants subsequently requested that this Court confirm the FINRA ruling pursuant to section § 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., and dismiss Mr. Walzer's federal claims under the Exchange Act.  In support of that request, Defendants contended that, despite the fact that Mr. Walzer's federal claims were not at issue in the New York state litigation or subsequent FINRA arbitration, the FINRA panel's findings of fact precluded those claims.  Additionally, Defendants argued that Mr. Walzer's Exchange Act claims were time-barred and were not pled with sufficient particularity.

In its August 10, 2010 ruling, the Court denied Defendants application for confirmation of the FINRA arbitration award, but granted their request that Mr. Walzer's federal Exchange Act claims be dismissed.  In denying Defendants request for confirmation of the arbitration award, the Court noted that Mr. Walzer's state law claims had already been dismissed.  Thus, it ruled that the Defendants request for confirmation of the FINRA judgment must be premised on the FAA.  The Court then held that § 9 of that statute, by stating that the parties to an arbitration may apply for confirmation of an award "to the United States court in and for the district within which such award was made," 9 U.S.C. § 9, impliedly prohibits federal courts outside the geographic district in which an arbitration award was made from confirming that award.  Walzer II, 2010 WL 3174458 at *5 (citing 9 U.S.C. § 9.)  Since the FINRA arbitration at issue in this case occurred in New York, the Court determined that it was "without power under the FAA to confirm that award."  Id.

The bulk of the Court's analysis in its August 10, 2010 ruling was devoted to Mr. Walzer's claims under the Exchange Act.  In addressing those claims, the Court first rejected

Defendants' contention that they were precluded by the FINRA panel's findings of fact.  It noted

that the Full Faith and Credit Statute, 28 U.S.C. § 1738, which governs the preclusive effect

given to the judgments of other tribunals by federal courts, does not apply to arbitration awards

that have not yet been confirmed by a state or other federal court.  Id. (citing N.L.R.B. v. Yellow

Freight Sys., Inc., 930 F.2d 316, 319 (3d Cir. 1991) ("Section 1738 does not by its terms apply to

the findings of an arbitrator, and the Supreme Court has held that section 1738 preclusive effect

need not be given to an unreviewed arbitration award.")).

      After ruling that the FINRA decision did not preclude Mr. Walzer's Exchange Act claims

under 28 U.S.C. § 1738, the Court addressed the question of whether the arbitration panel's

findings of fact were entitled to preclusive effect under federal common law.  It noted that "the

Supreme Court has held that arbitral awards should not be given preclusive effect when (1)

'Congress intended the statute [ ] at issue ... to be judicially enforceable' and (2) 'arbitration

could not provide an adequate substitute for judicial proceedings in adjudicating claims under

th[at] statute.'  Id. (quoting MacDonald v. City of West Branch, 466 U.S. 284, 288 (1984)).  The

Court ruled that "[b]oth factors apply here."  Id.  With respect to the first, the Court held that

"[t]here is no question that Congress intended the Exchange Act to be judicially enforceable."

Id. at *6.  In fact, the Exchange Act "vests exclusive jurisdiction … in the federal courts" over

suits brought under its auspices.  Id. (citing 15 U.S.C. § 78aa).

      Next, the Court turned to whether the FINRA arbitration provided an adequate substitute

for judicial proceedings.  In ruling that it did not, the Court noted that (1) it was "unclear whether

the 1992 options agreement required Mr. Walzer to submit claims under the Exchange Act to

arbitration" because neither MSC nor Mr. Walzer produced the 1992 options agreement in the

New York litigation and (2) "the New York court's judgment compelled arbitration of only Mr.

Walzer's state claims."  Id. (citing Walzer I, 221 F. App'x at 156 ("The only issue actually litigated in Walzer's state case was whether the 1992 agreement mandated arbitration of the fraud, breach of contract, and breach of fiduciary duty claims that he had brought.")).  "Thus, the FINRA panel did not focus while making its factual determinations on whether the wrongdoing of which Defendants were accused constituted a violation of the Exchange Act – a factual inquiry that may, given the complex nature of that statute, differ from the one necessary to resolve Mr. Walzer's state law claims – and it would have been without the power to enforce any judgment to that effect."  Id.  Additionally, the Court noted the well-established principle that "arbitral factfinding is not generally equivalent to judicial factfinding."  MacDonald, 466 U.S. at 291.  It then applied that principle to this case, stating:

> While the factfinding process undertaken by the FINRA panel appears to have been extensive, it did not afford Mr. Walzer the same opportunity to develop his claims as he would have had in federal litigation.  Most importantly, it is undisputed that the FINRA panel issued its decision without the benefit of discovery.  Moreover, even if the parties had engaged in discovery and compiled a record equivalent to the one that would be created by federal litigation, the fact that Mr. Walzer's Exchange Act claims were not at issue in the proceedings below would have precluded him from effectively developing the factual record relating to those claims.  Therefore, the Court rules that the FINRA panel's factual finding that Mr. Walzer suffered no damages does not preclude his claims under the Exchange Act.

Walzer II, 2010 WL 3174458 at *6.

After dealing with Defendants' contention that Mr. Walzer's Exchange Act claims were precluded by the FINRA panel's factual findings, the Court turned to their argument that those claims were time-barred.  In rejecting that argument, it stated:

> Under section 804 of the Public Company Accounting Reform and Investor Protection Act of 2002, commonly known as the "Sarbanes-Oxley" Act, private actions for alleged violations of the Exchange Act must be brought either five years after such violations or two years after their discovery, whichever is earlier.  28 U.S.C. § 1658(b).  Mr. Walzer filed this suit on November 17, 2004.  His claims under the Exchange Act are based in large part on his contention that the

Defendants conspired to impermissibly force the sale of securities in his account by creating a forged options agreement that required him to maintain a higher percentage of equity in that account that he had previously agreed to.  He alleges in his Complaint that he did not discover that forgery until "late November 2002," when the Defendants sent him a copy of that supposedly-forged agreement. (Compl. at 7, ¶ 16(h).)  Put differently, Mr. Walzer contends that the Defendants were part of an ongoing course of fraudulent activity, and that he did not discover that activity until he was served with the forged agreement.  He does not specify the exact date on which he was given the allegedly-forged agreement, and Defendants have not demonstrated that date was prior to November 17, 2002 – in which case his claims would likely be time-barred.  Therefore, in keeping with its duty to draw all reasonable inferences in his favor when deciding the pending Motions to Dismiss, the Court will assume until it is proven otherwise that Mr. Walzer's claims are timely.

Id. at *7 (citation omitted).

Finally, the Court examined the substance of Mr. Walzer's allegations to determine whether he stated a cognizable claim for relief under the Exchange Act.  In doing so, it first parsed Mr. Walzer's Complaint, which is "not a model of clarity," id. at *4, to determine the exact nature of his purported claims under the Exchange Act.  The Court found four such claims, based on Mr. Walzer's allegations that the Defendants:

(1) Failed to serve him with a "a risks and terms type disclosure statement" at the time he opened his margin account in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-16 of its accompanying regulations,

(2) Committed fraud by forcing the sale of his securities and then supplying him with a forged copy of the options agreement in violation of section 10(b) of the Exchange Act and Rule 10b-5 of its accompanying regulations,

(3) Failed to maintain copies of his options agreement and produce that contract in a timely fashion in violation of section 17(a) of the Exchange Act, 15 U.S.C. § 17q(a)(1), and Rules 17a-3, 17a-4, and 17Ad-7 of its accompanying regulations; and

9

(4) Hypothecated the securities in his account in violation of section 8 of the Exchange

Act, 15 U.S.C. § 78h(c), and Rule 8c-1 of its accompanying regulations.

Walzer II, 2010 WL 3174458 at *7-8 (quoting (Compl. at 11-13, ¶ A)).

The Court ruled that Mr. Walzer's first claim – that MSC wrongfully failed to serve him

with a disclosure statement regarding margin trades at the time he opened his account in

violation of section 10(b) of the Exchange Act and Rule 10b-16 – was time-barred.  Id. at *8 n.5.

As Mr. Walzer acknowledged in his Complaint, he opened his MSC trading account "in the early

1980s," and any such violation would have occurred at that time.  See (Compl. at 13, ¶ A.)  Thus,

the five-year statute of limitations contained in the Sarbanes-Oxley Act would bar any claim

under Rule 10b-16.  Walzer II, 2010 WL 3174458 at *8 n.5 (citing 28 U.S.C. § 1658(b)).

Similarly, the Court found that Mr. Walzer had failed to state a cognizable claim for

securities fraud under section 10(b) of the Exchange Act and Rule 10b-5 of its accompanying

regulations.  In doing so, it first set forth the elements of such a claim, which requires a plaintiff

to allege six factors:

(1) a material misrepresentation or omission;

(2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance;

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and
    the loss.

McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007) citing Dura Pharms., Inc. v.
Broudo, 544 U.S. 336, 341-42 (2005).

The Court then held that Mr. Walzer had failed to satisfy those elements, stating:

Mr. Walzer has not pled reliance.  To the contrary, his allegations demonstrate conclusively that the misrepresentation of which he complains was not the cause of his injury.  In the only portion of his section 10(b)/Rule 10b-5 cause of action that did not consist of legal conclusions couched as factual allegations, Mr. Walzer stated that the Defendants "act[ed] with impunity and scienter by refusing to supply a copy of the margin agreement they alleged and claimed to have acted on for months during the margin sell-out period, and then instead sen[t] Plaintiff a clearly [f]orged agreement in an attempt to justify earlier unlawful taking control of plaintiff's account and securities."  (Compl. at 12, ¶ A.)  In other words, the misrepresentation on which Mr. Walzer bases his section 10(b)/Rule 10b-5 claim – the fact that he was provided with an options agreement which he claims was forged – did not occur until <u>after</u> the sale of his securities.  Thus, that sale could not have been undertaken in reliance on the misrepresentation.

Moreover, Mr. Walzer explicitly states in his Complaint that he was not deceived by, and did not rely upon, the Defendants' allegedly-false statements.  He contends that he objected almost immediately to MSC's request that he increase the percentage of equity held in his account by making "numerous phone calls" to both MSC and NFS and writing letters protesting the change (Compl. at 6-7 ¶¶ 16(e), (f)), and filing a written complaint with the National Association of Securities Dealers in September 2002.  (Compl. at 7, ¶ 16(g).)  Those objections were made either prior to or during the period in which MSC forced the sale of some of Mr. Walzer's securities, which were carried out over his objections and without his consent.  Thus, he cannot claim that he sold the securities at issue in reliance on the Defendants' alleged misrepresentations.  At best, his allegations set forth a claim that the Defendants breached his options agreement by forcing those sales.  As stated by the Court of Appeals, this Court may not entertain such claims in light of the fact that the New York court already compelled arbitration of Mr. Walzer's state breach of contract action.  <u>Walzer</u>, 221 Fed. App'x at 156 ("Walzer's state claims are precluded by collateral estoppel against all of the defendants because the issue of their arbitrability was clearly raised and decided against him in state court.").  Therefore, Mr. Walzer's section 10(b) and Rule 10b-5 claim will be dismissed.

<u>Walzer II</u>, 2010 WL 3174458 at *8-9 (emphasis in original).

The Court ruled that Mr. Walzer was without standing to assert his third claim – that by failing to provide a copy of his options agreement when he demanded they do so, the Defendants had violated section 17(a) of the Exchange Act and Rules Rules 17a-3, 17a-4 and 17Ad-7 of its accompanying regulations.  <u>Id.</u> at *9.  That ruling was based on the fact that section 17(a) and its attendant regulations do not "give rise to a private right of action whereby a litigant may seek to

enforce them through a suit for damages."  Id. (citing Touche Ross & Co. v. Redington, 442 U.S.

560, 569 (1979) ("[W]here, as here, the plain language of the provision weighs against

implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative

history that § 17(a) may give rise to suits for damages reinforces our decision not to find such a

right of action implicit within the section.")).

Turning to his last cause of action, the Court held that Mr. Walzer had failed to set forth a

cognizable claim for relief under section 8 of the Exchange Act and Rule 8c-1 of its

accompanying regulations, stating:

> That Rule … prohibits brokers from "hypothecate[ing] or arrang[ing] for or
> permit[ting] the continued hypothecation of any securities carried for the account
> of any customer under" certain circumstances.  17 C.F.R. § 240.8c-1.  In arguing
> that Defendants violated Rule 8c-1, Mr. Walzer apparently misunderstands the
> meaning of the word "hypothecate."  That term means "[t]o pledge property as
> security or collateral for a debt, without delivery of title or possession."  Black's
> Law Dictionary 811 (9th ed. 2009).  Mr. Walzer does not allege that the
> Defendants used the securities in his account as collateral for a debt; he simply
> claims that they sold them.  Therefore, those securities were not "hypotheticated,"
> and Mr. Walzer's invocation of Rule 8c-1 is inapposite.

Id. at *10.

Finally, the Court addressed the question of whether Mr. Walzer should be granted leave

to amend his Complaint in an effort to set forth a cognizable claim under the Exchange Act.  It

ruled that granting such leave would be futile, noting:

> [Mr. Walzer's] own allegations throughout this suit – which demonstrate that he
> did not rely on the Defendants' alleged misrepresentations – will make it
> impossible for him to assert a cognizable claim under section 10(b)/Rule 10b-5.
> He is without standing to assert claims under section 17(a) and its attendant
> regulations.  His Rule 8c-1 claim rests on a fundamental misunderstanding of that
> regulation, and the undisputed fact that his securities were sold rather than used as
> collateral for a debt discloses any possibility that he might be able to cure the
> defects in that claim.

Id.

In light of the futility of allowing Mr. Walzer to amend his Complaint, the Court dismissed his claims in their entirety with prejudice.  See Id. (citing In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (holding that a claim may be dismissed with prejudice, however, if amending the complaint would be futile)).

## II.  DISCUSSION

Mr. Walzer now moves pursuant to Federal Rule of Civil Procedure 60(b) for reconsideration of the Court's August 10, 2010 Order and Opinion.  His arguments in support of that request, as has been the case with his other submissions through the course of this litigation, are somewhat difficult to decipher.  It appears, however, that Mr. Walzer only challenges the Court's dismissal of two of his four federal claims under the Exchange Act:  (1) his allegation that the Defendants committed fraud by forging his options agreement in violation of section 10(b) and Rule 10b-5, and (2) his assertion that the Defendants wrongfully hypothecated his securities in violation of section 8 and Rule 8c-1.  Mr. Walzer's brief in support of his Motion for Reconsideration contains no arguments relating to his previous allegations that the Defendants violated Rule 10b-16, and states with respect to his claims under section 17(a) and Rules 17a-3, 17a-4, and 17Ad-7 that he "merely …wish[es] to preserve the right to bring this up on appeal if need be and after further research."  (Pl.'s Br. Supp. Mot. Recons. 8.)

With respect to his section 10(b)/Rule 10b-5 arguments, Mr. Walzer asserts that the Court erred in its August 10, 2010 Opinion by ruling that he will be unable to demonstrate reliance.  He admits that he did not receive the allegedly-forged options agreement until after the forced sale of his securities, see (id. at 2) ("It wasn't until late Nov. 2002, a month after the margin force-outs had ended, that [MSC] finally sent me a copy of that alleged agreement."), but argues that he "effectively" or "collaterally" relied on the forgery because MSC used it to induce another

Defendant, NFS, to carry out the sale.  <u>See</u> (<u>Id.</u> at 4) ("NFS was completely <u>relying on</u> the

Forged Account/Margin Application [MSC] sent them, to issue the Margin Calls, and those were

"collaterally applied" to me.  I was thus relying on the false representation … my account was

then in effect forced to rely on those margin calls based in turn on that Forged Agreement.")

(emphasis in original).  Based on that argument, which is largely duplicative of the theory he set

forth in his Complaint and previous submissions, <u>see</u> (<u>id.</u> at 4-5) (quoting extensively from

(Compl. at 4-5, ¶¶ 15, 16b)), he requests that the Court reinstate his claims under section 10(b) of

the Exchange Act and Rule 10b-5.

Mr. Walzer's arguments relating to his claim under section 8/Rule 8c-1 are similarly

repetitious of his earlier contentions.  Essentially, he argues that the Court erred in holding that

the Defendants did not hypothecate his securities.  In doing so, he asserts that "[t]he whole

process of a margin sell-out, requires hypothecation of the customers['] securities I believe,

pledging it as collateral for the margin loan to borrow."  (<u>Id.</u> at 9.)

In addition to arguing that the Court erred by dismissing his section 10(b)/Rule 10b-5 and

section 8/Rule 8c-1 claims, Mr. Walzer now contends that the Defendants' prior Motion to

Dismiss should not have been granted because it was an improper successive request in violation

of Federal Rule of Civil Procedure 12(g)(2).  He did not make that argument in any of his

previous submissions, including his opposition to the Defendants' Motion to Dismiss – the very

Motion that he now claims was improper.

**A.  Standard of Review**

"[I]t is well-established in this district that a motion for reconsideration is an extremely

limited procedural vehicle."  <u>Resorts Int'l v. Greate Bay Hotel & Casino</u>, 830 F. Supp. 826, 831

(D.N.J. 1992).  As such, a party seeking reconsideration must satisfy a high burden, and must

"rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." N. River Ins., 52 F.3d at 1218.

Since the evidence relied upon in seeking reconsideration must be "newly discovered," a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling. See Id. Local Civil Rule 7.1(i), which governs such motions, provides that they shall be confined to "matter[s] or controlling decisions which the party believes the Judge or Magistrate Judge has 'overlooked.'" The word "overlooked" is the dominant term, meaning that except in cases where there is a need to correct a clear error or manifest injustice, "[o]nly dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." Resorts Int'l, 830 F. Supp. at 831; see also Egloff v. N.J. Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988); Pelham v. United States, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

A decision suffers from "clear error" only if the record cannot support the findings that led to that ruling. United States v. Grape, 549 F.3d 591, 603-04 (3d Cir. 2008) (citations omitted). Thus, a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling; it must demonstrate that (1) the holdings on which it bases its request were without support in the record, or (2) would result in "manifest injustice" if not addressed. See Grape, 549 F.3d at 603-04; N. River Ins., 52 F.3d 1218. Mere "disagreement with the Court's decision" does not suffice. P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp., 161 F. Supp.2d 349, 353 (D.N.J. 2001).

**B.  Mr. Walzer's Arguments**

Under that standard, Mr. Walzer's request for reconsideration must be rejected.  None of his arguments are based on new evidence or an intervening change in law, and while he may disagree with the Court's earlier ruling, he does not point to any clear error.  To the contrary, Mr. Walzer's request for reconsideration appears to be premised wholly on contentions that were either considered and rejected in the August 10, 2010 Opinion or arguments that could have been presented prior to that ruling.

Even if the Court were to consider the substance of Mr. Walzer's arguments, his request for reconsideration would be unavailing.  In asserting that he "collaterally relied" on the forged options agreement because MSC used that forgery to convince NFS force the sale of his securities,[3] Mr. Walzer fundamentally misconstrues the elements of a Rule 10b-5 claim.  In order to sustain such a claim, a plaintiff must demonstrate reliance – "i.e., that but for the fraudulent misrepresentation or omission, <u>the investor</u> would not have purchased or sold the security." <u>McCabe</u>, 494 F.3d at 425 (emphasis added).  That reliance must be personal; it is not sufficient to argue that some third party was deceived when the plaintiff was not.  <u>See, e.g.</u> <u>Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 172 (3d Cir. 2001) ("It is axiomatic

---

[3] Mr. Walzer's argument implies that NFS executed the sale of his securities.  He did not make such a factual claim in his Complaint or other previous submissions, and its veracity is dubious in light of the strictly-segregated roles played by the various brokers involved in any given securities trade.  Mr. Walzer acknowledges in his Complaint that NFS is a "clearing broker." (Compl. at 2, ¶ 3.)  Such brokers do not order or execute trades themselves.  Rather, they log the records of trades made by others – known as "executing brokers" – with "national organization[s] devoted to tracking trades, such as the National Securities Clearing Corporation ("NSCC"), which processes the data contained in the disparate transactions [they] receive[] and transmit[] overarching information on the price movement of various securities and the cash holdings of the companies issuing those instruments back to the clearing brokers." <u>ABS Brokerage Servs., LLC v. Penson Fin. Servs., Inc.</u>, 2010 WL 2723173 at *1 (D.N.J. 2010).  However, in keeping with its duty to make all reasonable inferences in Mr. Walzer's favor, <u>see</u> <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997), the Court will assume the veracity of his allegation that it was NFS and not MSC that executed the forced sale of his securities.

that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he

or she reasonably and justifiably relied on an alleged misrepresentation.  This burden requires a

plaintiff to demonstrate that defendants' conduct caused him to engage in the transaction in

question.") (emphasis added, internal citations and quotations omitted); Landy v. FDIC, 486 F.2d

139, 155 (3d Cir. 1973) (A Rule 10b-5 action requires "injury to an investor caused by deceptive

practices touching on the purchase or sale of securities by that investor.") (emphasis added).

 As discussed in the August 10, 2010 Opinion, Mr. Walzer's allegations demonstrate

conclusively that the "deceptive practice" of which he complains – "the fact that he was provided

with a forged options agreement – did not occur until after the sale of his securities."  Walzer II,

2010 WL 3174458 at *9.  Therefore, Mr. Walzer could not have "relied" on that forgery.

 Mr. Walzer's current theory – that he "collaterally relied" on MSC's misrepresentation

because NFS did so in executing the sale of his securities – does not save his claim.  As a

preliminary matter, the Court notes the inconsistency between that theory, which Mr. Walzer

articulated for the first time in connection with the pending Motion for Reconsideration, and his

Complaint, in which he stated that MSC and NFS acted "in concert" and "conspired" to deceive

him.  (Compl. at 12, ¶ A.)  Mr. Walzer now contends that he should be allowed to amend his

Complaint to include his new theory.  In doing so, he repeatedly highlights his status as a pro se

litigant.  See (Pl.'s Br. Supp. Mot. Recons. 5, 9.)  While that status entitles Mr. Walzer to some

amount of indulgence, it does not grant him unlimited license to change the theories on which his

claims rest in order to circumvent earlier judgments of the Court – especially after six years of

protracted litigation.

 Nor would Mr. Walzer's new theory be meritorious even if credited by the Court.  As

discussed in the August 10, 2010 Opinion, Mr. Walzer "explicitly state[d] in his Complaint that

he was not deceived by, and did not rely upon, [MSC's] allegedly-false statements."[4]  Walzer II,
2010 WL 3174458 at *9.  He now contends that NFS provided the requisite reliance for his 10b-
5 claim by acting on MSC's misrepresentations regarding the level of equity he was required to
maintain in his account.  In doing so, however, he ignores his own knowledge.  Regardless of
whether NFS was deceived by MSC's alleged misrepresentations, Mr. Walzer knew prior to the
sale of his securities that those representations were false.  In light of that knowledge, he could
have taken steps to stop the sale, including temporarily increasing the percentage of equity held
in his account or seeking a judicial injunction.  Having failed to do so, Mr. Walzer can hardly
argue that MSC's conduct "caused him to engage in the transaction in question."  See Newton,
259 F.3d at 174.  To the contrary, the sale of his securities was carried out over his vociferous
objections.  While MSC may have breached the options agreement by implementing that sale – a
state law claim that this Court has already dismissed and whose dismissal the Court of Appeals
affirmed, see Walzer I, 221 F. App'x at 156 – Mr. Walzer's allegations fail to state a cognizable
cause of action under Rule 10b-5.  Therefore, the Court reiterates its August 10, 2010 ruling
dismissing that claim.

 Mr. Walzer's arguments relating to his claim under section 8 of the Exchange Act and
Rule 8c-1 of its attendant regulations do not merit extended discussion.  In order to sustain such a
claim, he must demonstrate that the Defendants "hypothecated" his securities – defined as
"pledg[ing] them as security or collateral for a debt, without delivery of title."  Black's Law
Dictionary 811 (9th ed. 2009).  It is abundantly clear from the record that they did not.  To the

---

[4] Prior to the forced sale of his securities, Mr. Walzer made "numerous telephone calls" to both
MSC and NFS protesting the impending sale.  (Compl. at 6-7, ¶¶ 16(e), (f).)  He wrote letters
protesting the increase in the percentage of equity that he was required to hold in his account.
(Id.)  He filed a written complaint with the National Association of Securities Dealers in
September 2002.  (Compl. at 7, ¶ 16(g).)  Thus, it is clear that Mr. Walzer did not accept the
statements being made by MSC.

contrary, the Defendants <u>sold</u> his securities – a transaction that transfers title from the seller to the buyer.  Mr. Walzer's contention that a "margin sell-out" necessarily "requires hypothecation" misunderstands the issue.  While <u>he</u> may have hypothecated his securities to MSC by pledging them as collateral for trades he made on margin, the Defendants did not do so by selling them when he failed to meet his margin call.  Therefore, the Court reiterates its August 10, 2010 decision dismissing Mr. Walzer's claim under section 8 of the Exchange Act and Rule 8c-1 of its accompanying regulations.

Finally, the Court rejects Mr. Walzer's contention that Defendants' earlier Motion to Dismiss was procedurally improper under Federal Rule of Civil Procedure 12(g)(2).  As discussed above, Mr. Walzer did not previously assert that argument, and it therefore cannot form a proper basis for reconsideration.  <u>N. River Ins.</u>, 52 F.3d 1218; <u>Resorts Int'l</u>, 830 F. Supp. at 831.  Moreover, his contentions are substantively inapposite.  Rule 12(g)(2) generally bars successive motions to dismiss.  However, a Court may consider such motions in cases where it did not examine the substance of the plaintiff's claims on the previous motion to dismiss.  <u>Knight v. ChoicePoint, Inc.</u>, 2010 WL 2667410 at *2 (D.N.J. 2010) (citing <u>Wright v. Cuyler</u>, 517 F. Supp. 637, 639 n.1 (E.D. Pa. 1981)).  Here, the Court originally dismissed Mr. Walzer's claims on the grounds that they were barred by <u>res judicata</u>.  It did not examine the substance of Mr. Walzer's pleadings to determine whether his federal claims were cognizable.  Therefore, Rule 12(g)(2) did not bar the Defendants from arguing after remand from the Court of Appeals that Mr. Walzer had failed to state a claim under federal law.  Moreover, Rule 12(g)(2) specifically provides that a defendant may file a second motion to dismiss under the circumstances set forth in Rule 12(h)(2).  That Rule allows defendants to assert failure to state a claim on which relief can be granted through a Rule 12(c) motion even if they have filed a previous motion to dismiss

under Rule 12(b)(6).  Therefore, the Court was within its power to construe the Defendants'

Motion to Dismiss as a request under Rule 12(c) and rule that Mr. Walzer had failed to assert a

cognizable claim under the Exchange Act.

## C.  Defendants' Contentions

As discussed above, in their opposition to Mr. Walzer's Motion for Reconsideration, the

Defendants argue that the Court's August 10, 2010 Opinion included three "factually inaccurate"

statements.  (Defs.' Br. Opp'n Mot. Recons. 7.)  The first concerns the fact that the Court

referred to the agreement between MSC and Mr. Walzer allowing the latter to trade securities on

margin as an "options agreement" throughout its August 10, 2010 ruling.[5]  As discussed above,

the term "options agreement" was drawn directly from the earlier ruling by the Court of Appeals.

See Walzer I, 221 F. App'x at 154 ("Walzer signed an options agreement with [MSC] giving him

margin privileges…") (emphasis added).

Moreover, it is obvious from the August 10, 2010 Opinion that the Court was referring to

the contract granting Mr. Walzer the ability to make margin trades.  In introducing that

agreement, the Court used language substantially similar to that of the Court of Appeals, stating

"[i]n 1982, Mr. Walzer signed an options agreement with MSC that gave him margin privileges."

Walzer II, 2010 WL 3174458 at *1.  Thus, subsequent references to the "options agreement"

clearly referred to the contract allowing Mr. Walzer to trade on margin.

Finally, the Court notes that neither Mr. Walzer nor the Defendants have managed –

despite the protracted six-year history of this litigation – to produce a copy of the options

agreement.  See Walzer I, 221 Fed. App'x at 156 ("[I]t is unclear … what the arbitration

agreement said.  [MSC] has only produced a 1994 form agreement that it claimed was identical

in all material aspects to the 1992 agreement that controlled the outcome of the New York

---

[5] Mr. Walzer makes a similar claim.  See (Pl.'s Br. Supp. Mot. Recons. 4-5.)

case.").  Had they done so, it would have been possible for the Court to refer to the title of that

contract rather than using a generic term.  Without the benefit of the actual agreement, however,

the Court is satisfied to use the same terminology as the Court of Appeals, and declines to alter

its August 10, 2010 Opinion to conform to Defendants' preferences.

Defendants' contention that the Court erred by referring at one point in its Opinion to the

"1982" options agreement is similarly meritless.  In their opposition to Mr. Walzer's Motion for

Reconsideration, the Defendants speculate that the Court's use of "1982" was "an apparent

typographical error."  (Defs.' Br. Opp'n Mot. Recons. 8-9.)  It was not.  To the contrary, a

reading of the full paragraph in which the Court mentioned the year 1982 demonstrates that its

reference to that year was meant only to show when Mr. Walzer first gained the right to trade

securities on margin.  That paragraph, which was the first in the "background" section of the

ruling, stated:

> Mr. Walzer opened a personal brokerage account with Defendant Muriel Siebert
> and Company, Inc. ("MSC"), a New Jersey brokerage firm, in 1980 and continued
> investing with that company for over 20 years.  In 1982, Mr. Walzer signed an
> options agreement with MSC that gave him margin privileges.  Beginning as early
> as 1996, he purchased securities on margin through his account with MSC.  Mr.
> Walzer and MSC periodically renewed the options agreement throughout their
> relationship.

Walzer II, 2010 WL 3174458 at *1.

Again, that statement was substantially similar to one made by the Court of Appeals in its earlier

ruling, in which it noted that "[i]n 1982, Walzer signed an options agreement with Siebert giving

him margin privileges, and, at least since 1996, Walzer purchased securities on margin through

this account."  Walzer I, 221 F. App'x at 154 (emphasis added).

Moreover, the rest of the August 10, 2010 ruling makes it clear that the Court's reference

to the 1982 version of the options agreement was aimed at providing historical context rather

than discussing the operative version of that contract.  The Court went on to state that, after the

controversy surrounding the forced sale of Mr. Walzer's securities, "MSC produced a copy of

what it claimed was Mr. Walzer's most recent options agreement, which was dated August 29,

1996."  Id.  Two paragraphs later, it noted that, after Mr. Walzer claimed the 1996 agreement

was a forgery and filed an action in New York state court:

> MSC moved to compel arbitration of the New York action pursuant to the 1996
> options agreement.  In January 2005, the New York court granted that request,
> and stayed the state action pending arbitration before a FINRA panel.  In doing
> so, it held that, even if the 1996 agreement was a forgery and thus invalid, the
> last undisputedly authentic iteration of the options agreement – from 1992 – included
> an arbitration clause which mandated arbitration of his claims before the FINRA
> panel.

Id. (emphasis added).

From that point onward, the Court referred only to the 1992 version of Mr. Walzer's options

agreement – the version that Defendants' acknowledge governs for the purposes of this litigation.

See Id. at *2 ("[T]he Court of Appeals held that the New York court could not have ruled on

whether the 1992 agreement requires Mr. Walzer's federal claims to be submitted to

arbitration."), *5 n.3 ("[T]he Supreme Court of New York has already ruled that Mr. Walzer's

state law claims were subject to the arbitration clause contained in the 1992 Agreement."), *6

("[I]t is unclear whether the 1992 options agreement required Mr. Walzer to submit claims under

the Exchange Act to arbitration.").  Therefore, the Court attributes Defendants' contention that

its reference to "1982" in its earlier ruling was erroneous to a failure to meticulously review that

ruling, and declines to alter the August 10, 2010 Opinion.

Finally, the Court rejects Defendants' contention that it erred by stating that the FINRA

arbitration panel made its decision "without the benefit of discovery."  See Id. at *6.  That

statement was drawn directly from NFS's brief in support of its Motion to Dismiss Mr. Walzer's

claims under the Exchange Act, in which the company explicitly acknowledged that the FINRA

panel "scheduled a hearing on the motions to dismiss before the parties were to have full blown

discovery."  (NFS's Br. Supp. Mot. Dismiss 25.)  Elsewhere in its brief, NFS noted that the

Defendants had produced "almost 700 pages of documents" in response to Mr. Walzer's "initial

discovery requests," but there were various discovery disputes pending at the time the FINRA

panel dismissed Mr. Walzer's claims.  (Id. at 24-25) ("The panel did nothing improper by

hearing the oral argument on the motions to dismiss before addressing either parties' discovery

motions."); see also (Id. at 10) ("After some discussion regarding discovery productions and

discovery disputes, the Panel decided that it would first hear the arguments and presentations on

the motions to dimiss.").

 In discussing the discovery process that took place during the FINRA arbitration, NFS

pointed out that "there is nothing wrong with hearing motions to dismiss before discovery is

completed."  (Id. at 25.)  That assertion is correct.  In fact, it is well-established that an

arbitration panel may limit discovery in keeping with the terms of the agreement between the

parties.  Hay Grp., Inc. v. E.B.S. Acquisition Corp., 360 F.3d 404, 409 (3d Cir. 2004) ("A

hallmark of arbitration – and a necessary precursor to its efficient operation – is a limited

discovery process.") (quoting COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 267, 276 (4th Cir.

1999).  The paragraph in the Court's August 10, 2010 that included the statement that

Defendants now contend was erroneous was aimed at making that point.  It began by setting for

the well-established principle that "arbitral factfinding is generally not equivalent to judicial

factfinding."  Walzer II, 2010 WL 3174458 at *6 (quoting MacDonald, 466 U.S. at 291 ("[T]he

record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply;

and rights and procedures common to civil trials, such as discovery, compulsory process, cross-

examination, and testimony under oath, are often severely limited or unavailable.").  The Court

then noted that:

> While the factfinding process undertaken by the FINRA panel appears to have
> been extensive, it did not afford Mr. Walzer the same opportunity to develop his
> claims as he would have had in federal litigation….     Moreover, even if the
> parties had engaged in discovery and compiled a record equivalent to the one that
> would be created by federal litigation, the fact that Mr. Walzer's Exchange Act
> claims were not at issue in the proceedings below would have precluded him from
> effectively developing the factual record relating to those claims.  Therefore, the
> Court rules that the FINRA panel's factual finding that Mr. Walzer suffered no
> damages does not preclude his claims under the Exchange Act.

Id.

Thus, it is clear from a reading of the full paragraph in which the supposedly-erroneous

statement appeared that the Court's discussion of the discovery process that took place during the

arbitration was aimed at showing that the FINRA panel's findings of fact did not preclude Mr.

Walzer's federal claims under the Exchange Act.

That discussion was not meant to impugn the FINRA panel's ultimate ruling that Mr.

Walzer's state claims lack merit, and should not be construed as having done so.  While the

Court realizes that Mr. Walzer is a difficult litigant and regrets that he may, as stated by

Defendants in connection with this Motion, "seize[] upon" the language in the August 10, 2010

Opinion "as a reason for non-confirmation of the FINRA award on the state law claims," (Defs.'

Br. Opp'n Mot. Recons. 9), the mere fact that Mr. Walzer may take the Court's statements out of

context does not render them erroneous.  To the contrary, in light of (1) the well-established

principle that arbitral factfinding does not provide a discovery process equivalent to the one

engaged in by the federal courts and (2) the fact that NFS explicitly acknowledged in its brief

that the FINRA panel addressed the Defendants' motions to dismiss Mr. Walzer's state law

claims prior to resolving certain discovery disputes, the Court was correct in stating that the

arbitration decision "was made without the benefit of discovery."  Walzer II, 2010 WL 3174458 at *6.  Therefore, the Court declines to remove that statement from its August 10, 2010 Opinion. For the sake of absolutely accuracy, however, it will insert the word "completed" such that the ruling will read "without the benefit of completed discovery."

### III.  CONCLUSION

For the reasons set forth above, Mr. Walzer's Motion for Reconsideration is denied.  The Court reaffirms its August 10, 2010 ruling and declines to alter the language used therein, except that the word "completed" will be inserted as discussed above.

The Court will enter an Order implementing this Opinion.


**\_s/ Dickinson R. Debevoise_____**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:  October 28, 2010